**OBERMAN & CO., Inc., v. UNITED GARMENT WORKERS OF AMERICA et al.**

No. 145.

District Court, W. D. Missouri, S. D.

Sept. 25, 1937.

HornBostel, of Jefferson City, Mo., for defendants.

REEVES, District Judge.

The bill filed in this cause and the motion to dismiss involve the proper application of certain statutory enactments of the Congress relating to the subject of labor.

The bill, in substance, charges that the plaintiff is operating a factory in the city of Springfield, Mo., and in its business employs approximately 950 persons. It avers that the values of its manufactured products aggregate approximately $2,000,-000 annually, and that it purchases from points outside of the state of Missouri large quantities of raw material, and through channels of interstate commerce it brings such raw material into the state. Thereafter, through the same channels, it ships and regularly sells beyond the state boundaries large and heavy consignments of its manufactured product.

Because of its commitments for raw material and on its manufactured products, it claims that interference with its operations would materially and directly burden, obstruct, and interfere with interstate commerce.

It places the losses or damages by reason of such interference at a large sum of money.

The plaintiff complains that the defendants are and have been interfering with its factory operations by the use of threats, force, and violence. The personal or individual defendants, according to the bill, are members of labor organizations, former employees of the plaintiff and other persons sympathetically acting in conjunction with them in the alleged interference with factory operations.

It is specifically recited in the bill that: "without interference, restraint, coercion, or domination of any kind or character on the part of plaintiff," a majority of the employees of the plaintiff availed themselves of the right of self-organization and of collective bargaining through representatives of their own choosing in respect to rates of pay, wages, hours of employment, and other conditions of employment and any and all other matters for their mutual aid or protection as guaranteed to them under the provisions of "an act of Congress of July 5, 1935," commonly referred to as the "National Labor Relations Act" (29 U.S.C.A. §§ 151–166).

Frank C. Mann (of Mann, Mann & Miller), of Springfield, Mo., and James A. Potter (of Ragland, Otto & Potter), of Jefferson City, Mo., for plaintiff.

Charles V. Garnett, and Clif Langsdale, both of Kansas City, Mo., and James

Such an organization was formed prior to the 7th day of May, 1937, under the name of Springfield Oberman Employees' Association.

A board of 9 persons was selected from their number to represent the organization for the purposes of collective bargaining, and as the authorized representative of the majority of said employees. This organization was formed, as it is alleged, to negotiate a contract with plaintiff with respect to rates of pay, wages, hours of employment, and other conditions of employment.

Previous to this time the employees had not been organized in such way as to comprehend or include a majority in any one organization, and all the contracts of employment were individual in character.

It is alleged that on May 7, 1937, representatives of the association or union presented proof that a majority of the employees had authorized them to act through a regularly formed union, and thereupon a contract contemplated by law was entered into and became effective from June 7, 1937, until December 31, 1937.

A supplemental agreement was thereafter made limiting the employment in the factory to those only who were members of said Springfield Oberman Employees' Association. This was a closed shop arrangement.

Approximately 40 employees declined to affiliate with the association, and, under the closed shop arrangement, therefore were not eligible to continue their employment.

Thereafter the United Garment Workers of America, Local Union No. 216, acting through certain of the defendants, claimed to plaintiff that a majority of its employees were in fact members of said United Garment Workers of America, Local Union 216, and that therefore said organization was the chosen and legal representative of the majority for the purpose of collective bargaining.

The demand was then made that the plaintiff abrogate its contract with Springfield Oberman Employees' Association. Plaintiff was advised that unless it took such action a strike would be called, and through force and intimidation its shop would be closed.

The plaintiff did refuse to recognize the above-named local union until an election by the employees to determine their choice for a collective bargaining agency. On August 6, 1937, a strike was called, as threatened by the defendants. This strike was attended with violence and force and became so menacing as to compel the plaintiff to cease its factory operations. Plaintiff's factory remained closed from August 6, 1937, to August 23, 1937.

During this period, the only question agitated was whether the association of the employees was the valid bargaining agency or whether the defendant local union was the valid representative of a majority of the employees for collective bargaining purposes. Each organization claimed to represent a majority. The plaintiff had, theretofore, upon what it regarded as sufficient proof, recognized the union of its employees.

Plaintiff then requested the defendants to invoke the aid of the National Labor Relations Board for the calling and supervision of an election among the employees of plaintiff in order to determine the valid collective bargaining agent of its employees. While this request was at first refused, it is alleged that on August 20, 1937, the National Labor Relations Board, acting through its regional director, Hon. George O. Pratt, director for the seventeenth region, supervised an election which he had previously ordered to determine the choice of the majority of plaintiff's employees for a bargaining agency.

As a result of this election, so supervised, the regional director certified to plaintiff and to the defendant United Garment Workers of America Local Union No. 216, and to the Springfield Oberman Employees' Association: "That a majority of the employees of plaintiff had, by said election, chosen and designated the Springfield Oberman Employees' Association, through its officers and committee, as the representative of the employees, for the purpose of collective bargaining with plaintiff, with respect to rates of pay, wages, hours of employment and other conditions of employment."

When the certificate of the regional director was received, the plaintiff negotiated again with the representatives of the Springfield Oberman Employees' Association. The former contract was reaffirmed and continued in force for the term thereof, with the single modification that the closed shop clause was eliminated or suspended, and all of the former employees of the plaintiff, including the members of

the defendant union, were permitted to return to work.

It is alleged that, notwithstanding the results of the election and the certificate of the regional director, "The defendants continued to insist and demand of plaintiff that plaintiff enter into a contract with the United Garment Workers of America Local Union Number 216"; and that it be designated "as the sole representative of all its employees for the purpose of collective bargaining with plaintiff and providing for a closed shop, that is to say, that plaintiff employ no person engaged in the manufacture of garments who is not a member of said United Garment Workers of America, and through the defendants, W. R. Brooks, Chester A. Holden, and other defendants, threatened the officers of plaintiff to close plaintiff's factory, to surround the same with pickets and by force and violence, if necessary, prohibit any of plaintiff's employees entering or leaving plaintiff's manufacturing establishment; that on Sunday, August 29, 1937, as a result of a meeting and decision of the members of the defendant, United Garment Workers of America Local Union Number 216, the defendants caused a large number of persons to be placed around and about the manufacturing establishments of plaintiff in Springfield, Missouri, and since that time the defendants, by acts of violence, threats and intimidation, have prohibited and are now prohibiting the employees of plaintiff from entering or leaving plaintiff's manufacturing establishment or doing work therein and have prohibited and are prohibiting the plaintiff from shipping any materials into or any manufactured garments from its manufacturing establishment and the defendants have threatened and are now threatening that if any person, other than the regular watchmen employed by plaintiff, enter or attempt to enter plaintiff's plant, they will be prohibited therefrom by force, as a result of which the plaintiff has been forced to close its said manufacturing establishment, to forego the shipment of raw materials thereto, the manufacture of garments therein or the shipment of garments therefrom, either in interstate commerce or otherwise."

The bill then contains averments to the effect that if its shop or its plant should be opened: "It would result in serious personal injuries to its employees and serious, permanent and costly damage to its buildings, equipment and other property; that the public officers, charged with the duty to protect plaintiff's property, are unable to furnish adequate protection therefor; that between the dates of August 6th and August 23rd, during the time plaintiff's manufacturing plant was closed because of the unlawful conduct of the defendant * * * one of the plaintiff's employees was assaulted, beaten and threatened with death, unless he left the City of Springfield, upon the asserted ground that he was interfering with the attempt of defendants to compel recognition of the United Garment Workers of America Local Union Number 216 by plaintiff; that numerous employees of plaintiff, mostly women, who attempted to enter plaintiff's manufacturing establishment for the purpose of going to work, were assaulted and beaten by defendants, their clothing torn and efforts made to entirely disrobe them; that the defendants sought to prohibit and did prohibit, by force and threats of violence, the conveyance into plaintiff's plant of food, clothing and other necessary supplies for the employees of plaintiff who were in said plant, solely to guard and protect the same against damage by defendants; that defendants followed and threatened with personal violence employees of plaintiff who were guarding plaintiffs property; that the defendants, W. R. Brooks, Chester A. Holden, Earl Dietz, and numerous other defendants, in public speeches in the presence of groups of plaintiff's employees and in meetings of the defendant union and in interviews to the public press and radio, have stated that plaintiff's plant would never open until plaintiff recognized the United Garment Workers of America Local Union Number 216 as the sole bargaining agent of all of its employees. * * *"

The bill then sets out what the plaintiff conceives to be a conspiracy to prevent the operation of the factory and to destroy the business thereof. It is charged: "That by reason of the character of the acts complained of, plaintiff has suffered and will continue to suffer an immediate and irreparable injury, loss and damage to its property before notice can be served on defendants and a hearing had thereon and unless a temporary restraining order shall be issued * * * that plaintiff is without an adequate remedy at law and that, by reason of the acts aforesaid, an emer-

24

gency exists and that it is imperative that a temporary restraining order issue from this court. * * *"

The prayer of the petition asks for an injunction to restrain the commission of the unlawful acts enumerated, and asks for a further judgment for damages which the plaintiff avers it has suffered.

To the foregoing bill the defendants served with process have interposed a motion to dismiss upon the several grounds: (a) That there is total failure of compliance by plaintiff with the provisions of the law known as the Norris-LaGuardia Act (29 U.S.C.A. §§ 101–115), and particularly section 107, title 29 U.S.C.A.; (b) that upon the face of the bill it appears that the court is without jurisdiction; (c) because the averments of the petition are insufficient to confer jurisdiction, and (d) because of a misjoinder of causes of action.

These will be noted and discussed in their order, and other facts as they may become pertinent will be stated.

1. On the first challenge to the petition it is asserted that there was a failure to comply with the Norris-LaGuardia Act of the Congress. This act was approved March 23, 1932, and constitutes sections 101 to 115 inclusive, title 29 U.S.C.A., relating to the general subject of labor. The chapter, however, is designated as "Jurisdiction of Courts in Matters Affecting Employer and Employee."

■ The object of this act was to limit the injunctive power of the United States courts in cases of labor disputes. It took away the jurisdiction of the courts: "To issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter." 29 U.S.C.A. § 101.

The public policy declared in the act was to protect the freedom and liberty of the individual employee to contract with his employer and to obtain such freedom either in his individual capacity or in association with others. And, moreover, that such freedom shall be such "that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in oth-er concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C.A. § 102.

■ An examination of the various sections of the Norris-LaGuardia Act convinces that it was the judgment of the Congress that no restraining order or injunction should be issued save under very exceptional circumstances, and not then, until, in open court, testimony had been heard "with opportunity for cross-examination." The exception was, as stated in the report of the Senate Judiciary Committee: "In cases where such action is imperatively demanded; and yet injunctive relief is often the only adequate and effective relief against many wrongs and to prevent many irreparable injuries in controversies of infinite varieties."

The definition of labor disputes is very broad and comprehended a great variety of controversies not necessarily involving a dispute between the employer and the employee. It must be conceded that, if the present litigation falls within the purview of the Norris-LaGuardia Act and there is in fact a labor dispute, then the restraining order was improvidently granted and the bill should be dismissed.

The first question, then, is whether the Norris-LaGuardia Act applies to the facts under consideration.

Three years and three months after the passage and approval of the Norris-LaGuardia Act, the Congress passed a law known as the National Labor Relations Act. This is found as chapter 7, embracing sections 151 to 166 inclusive, title 29 U.S.C.A. This new enactment related to the general subject of labor and is commonly referred to as the Wagner-Connery Labor Relation Act. This act, at least in part, covers the same subject matter as the Norris-LaGuardia Act. The declared policy of the Congress was to protect employees in their right to organize and to outline a procedure for collective bargaining. A failure thus to protect employees in their right to organize for collective bargaining caused business disturbances, and, as declared by Congress, affected and burdened interstate commerce and the general current of commerce.

"Experience has proved," says the act, "that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes.

the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees." 29 U.S.C.A. § 151.

It was then declared the policy of the government to eliminate obstructions "by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C.A. § 151.

After appropriate and clarifying definitions, provision was made for the creation of a National Labor Relations Board. A code of understandable rules was enacted for the guidance of the Board, and then its powers and its procedure defined.

The full purpose of the act was to encourage and protect employees in their procedure for collective bargaining. The bill clearly shows that the difficulties experienced in this case were not in a labor dispute, but in the procedure for collective bargaining.

Section 159, title 29 U.S.C.A., specifically provides that:

"(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment:

"Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer."

It should be recalled that plaintiff's bill, confessed to be true by the motion to dismiss, contains appropriate averments to the effect that an organization within the plant had made proof of its qualifications by having a majority of the employees, and was recognized for the purposes outlined by statute.

The proviso of said paragraph (a) of said section 159 is not important in these considerations for the reason that, according to the bill, neither an individual nor a group of employees at any time has presented any grievance to the employer.

It is alleged in the bill that the defendants denied the numerical strength of the shop organization and demanded that recognition be given to it or them. At that time there was no labor dispute. The factory union had brought proof of its numerical strength and its right under the statute to "be the exclusive representative of all the employees."

In this situation the plaintiff requested the defendants to petition the National Labor Relations Board to assume jurisdiction of the matter and to determine the lawful bargaining agency. This was done as authorized by paragraph (c) of said section 159. That paragraph is as follows: "(c) Whenever a question affecting commerce arises concerning representation of employees, the Board may investigate such controversy and certify to the parties, in writing, the name or names of the representatives that have been designated or selected. In any such investigation, the Board shall provide for an appropriate hearing upon due notice, either in conjunction with a proceeding under section 160 of this title or otherwise, and may take a secret ballot of employees, or utilize any other suitable method to ascertin * such representatives."

Honorable George O. Pratt, a member of the Board, and the regional director, promptly assumed jurisdiction of the matter as he was authorized to do under the section last above quoted, and took a secret ballot of the employees. This election, according to the bill, resulted in a victory for the factory union, and the regional director so certified to all of the parties, including the plaintiff and the defendants.

Most emphatically, therefore, the entire proceeding was not under the Norris-LaGuardia Act, supra, but was under the Wagner-Connery Act, commonly known as the National Labor Relations Act. If there were a dispute, it was in connection with the procedure under that act.

Apparently by paragraph (d) of said section 159 it was contemplated that the inquiry authorized by said paragraph (c)

* So in original.

of said section should be conformable to the procedure outlined in the various paragraphs of section 160. For instance, said paragraph (d) says: "Whenever an order of the Board made pursuant to section 160 (c) of this title is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) of this section, and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed under subsections 160 (e) or 160 (f) of this title."

Section 160 of the title confers certain general powers upon the National Labor Relations Board. It also prescribes a procedure for the Board and the manner in which its acts shall be reviewed. It seems a reasonable construction that it was the intention of the Congress to bring subsection (c) of section 159 within the procedure outlined in said section 160. By subsection (h) of section 160 there may be found a general title "Jurisdiction of courts unaffected by limitations prescribed in chapter 6 of this title." Note the language: "When granting appropriate temporary relief or a restraining order, or making and entering a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part an order of the Board, as provided in this section, the jurisdiction of courts sitting in equity shall not be limited by sections 101 to 115 of this title."

▇▇ It will be observed from this that the Congress made the Norris-LaGuardia Act inapplicable to situations such as are here presented. It cannot be successfully argued that the Congress did not contemplate a restraining order or an injunction by a District Judge, for the reason that section 160 particularly contemplates that reviews shall be by the Circuit Court of Appeals. The District Court, therefore, was regarded as having jurisdiction in controversies like the one here presented. The regional director certified the names of those who had been selected for bargaining purposes. The statute does not clothe the National Labor Relations Board with power to enforce such order. It was doubtless the thought of the Congress that, where the National Labor Relations Board had exhausted its power, the court could then possess the jurisdiction to make effective the work of the National Labor Relations Board.

According to the averments of the bill there could not be a labor dispute in this case. The National Labor Relations Board has settled the only controversy in the case. It was authorized to do this by statute. Its certificate stands unchallenged.

As said in an analogous case by the Supreme Court in Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, loc. cit. 562, 57 S.Ct. 592, 606, 81 L.Ed. 789: "Its certificate that the Federation is the authorized representative of the employees is the ultimate finding of fact prerequisite to enforcement by the courts of the command of the statute. * * * The certificate which conformed to the statutory requirement, was prima facie sufficient, and was not shown to be invalid for want of the requisite supporting facts."

The certificate in the case cited was issued by the United States Railway Labor Board, but clothed with similar power and its order issued in the precise manner followed by the regional director in this case.

So far as this record shows, therefore, all controversies have been ended and the command of the statute is that the representatives certified by the regional directors "shall be the exclusive representatives of all the employees." 29 U.S. C.A. § 159 (a).

Since by express provision the Norris-LaGuardia Act is made inapplicable in this proceeding, the restraining order was granted in the usual manner. And the first contention made by able counsel for the defendants must be held untenable.

▇▇ 2. The second ground of the motion to dismiss is stated in general language. It says that the bill should be dismissed, "Because, as affirmatively appears from the face of said petition for injunction, this Court is without jurisdiction to issue any temporary restraining order or temporary or permanent injunction herein."

This ground, so broadly stated, challenges the sufficiency of the bill in a formal way.

An inspection of the bill discloses that the defendants, without just or legal excuse, are threatening and interfering with force and violence, not only to interrupt plaintiff's operations, but to destroy its business.

For the purposes of this motion it must be assumed that these averments are true.

In great detail this bill specifies in what manner the interruptions and the damage to its business are being done and committed. If these facts be true, clearly, plaintiff would be entitled to restrain the defendants from doing unlawful things which, according to the bill, they have no right to do.

Senator Norris, who was one of the authors of the Norris-LaGuardia Act, said concerning it: "This bill does not—and I cannot repeat it too many times—this bill does not prevent the court from restraining any unlawful act. * * * Contrary to the belief of some people, this bill does not attempt to take away from the Federal courts all power to restrain unlawful acts or acts of fraud or violence in labor disputes."

The above quotations may be found in United Electric Coal Companies v. Rice (C.C.A.) 80 F.(2d) 1, loc. cit. 8.

In this case, if the statements be true, the defendants petitioned the National Labor Relations Board to supervise an election among plaintiff's employees; awaited the results of the election and the certificate of the regional director; and, then, in total disregard of their solemn, implied pledge to abide the results of the election, fomented discord, encouraged, and even committed violence.

The general averments of the bill are invulnerable as against the challenge as to its sufficiency.

3. In view of the discussion of the first and second grounds of the motion, it is unnecessary to discuss the third count of the defendants' motion. This is a repetition of the charge that the bill is insufficient.

4. The defendants ask for a dismissal of the bill because of an alleged misjoinder of causes of action. It is asserted that the suit is in equity for an injunction and one at law for damages. The claim for damages is one asserted as and incident to the alleged violence and interruptions caused by the defendants.

Equity Rule 26 (28 U.S.C.A. following section 723) provides that: "The plaintiff may join in one bill as many causes of action, cognizable in equity, as he may have against the defendant. * * * If it appear that any such causes of action cannot be conveniently disposed of together, the court may order separate trials."

■ It may be conceded, of course, that a case in equity and one at law cannot be united in the same action. It is the rule, however, that equity, when it takes jurisdiction of a subject, will do justice, and not by halves.

■ If, therefore, an adjudication of a law matter follows logically in the wake of the equity proceeding, the court will, in the same proceeding, dispose of a law question. It does not seem proper to discuss here this technical question. A case is presented of great moment to the public, and particularly to the community disturbed by the actions of the defendants. At the present time the employees of the plaintiff are all at work regardless of their affiliations. The flow of commerce is uninterrupted. It was the object of the law to remove the sources of industrial strife and unrest "by encouraging practices fundamental to the friendly adjustment of industrial disputes."

■ In the instant case there is no industrial dispute. If such dispute ever existed, it has been settled by the only authority that could settle such controversy, the National Labor Relations Board. For the court now to dismiss the bill on the ground of technical defect or weakness in surplus averments of the bill would be to permit a recurrence of the disorders which caused a complete shutdown of the factory, took away the employment and wages of 950 employees, and created discord, dissension, and unrest in the community where the factory is located.

■ As was said in Virginian Ry. Co. v. System Federation No. 40, supra, 300 U.S. 515, loc. cit. 552, 57 S.Ct. 592, 601, 81 L.Ed. 789: "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved. * * * The fact that Congress has indicated its purpose to make negotiation obligatory is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief."

5. Examination has been made of the authorities to which able counsel for the defendants have called attention, but I do not find one opposed to the views here expressed. Practically all of the cases cited were decided under the Norris-La-

Guardia Act and before the enactment of the Wagner-Connery Law.

Both sides have quoted from the opinion of Judge Nordbye in Lund v. Woodenware Workers Union (D.C.) 19 F. Supp. 607. In that case, as in this case, the defendant challenged the jurisdiction of the court on the grounds that no federal question was involved. Enough has been said to indicate that in the case now being considered a federal question is involved and because of it the jurisdiction of the federal court attaches. The amount in controversy, as stated in the bill, is in excess of $3,000. Judge Nordbye dismissed the bill in the Lund Case because the matter was in such condition that he believed the National Labor Relations Board had exclusive jurisdiction. In his opinion he constantly intimated that jurisdiction might be acquired by the court when the National Labor Relations Board had exhausted its authority. For instance, at page 610, of 19 F.Supp., he said: "And no proceedings between employer and employee under the Wagner Act are entitled to any protection by the court until some affirmative action has been taken by the Labor Board, which is clothed with the only authority for such purposes."

He said again, at page 609, of 19 F. Supp.: "When it is recognized that the act only seeks to compel the employer engaged in interstate commerce to deal in collective bargaining with the representatives of the majority, the assumption that plaintiff makes herein, that any act of the employees which interferes with the integrity of a contract that he may have seen fit to negotiate with representatives of the majority gives rise to relief under the Wagner Act in the courts in absence of some action of the Board, seems entirely unsound and erroneous."

It was the opinion of Judge Nordbye, 19 F.Supp. 607, loc. cit. 609, that: "We would have the anomalous situation of the courts endeavoring to determine whether or not the unit which is formed by the majority of the employees is appropriate for the purposes of collective bargaining, when it is clearly evident that Congress intended that all such questions should be determined by the Labor Board and not by the courts. Whenever a situation requires relief by reason of the violation of section 159 (a), 29 U.S.C.A., it appears unmistakably that the National Labor Relations Board is vested with exclusive jurisdiction to effect the remedy."

The foregoing views of Judge Nordbye may be accepted. In this case, as frequently stated, the National Labor Relations Board has done all the things which Judge Nordbye indicated that it should do. In fact, the Board is powerless to take further action. Unless this court grants the relief sought, a condition heretofore existing will recur, and both life and property will be endangered.

It follows from the foregoing that the motion to dismiss should be overruled, and that the temporary restraining order should be continued until a hearing can be had on the question of the temporary injunction.

In order to facilitate the disposition of the case, it is suggested that counsel prepare to try the case on its merits so that, upon such final hearing, it may be determined whether a permanent injunction should be granted.

