**AMERICAN CHAIN & CABLE CO., Inc., v. TRUCK DRIVERS AND HELPERS UNION, LOCAL 676, A. F. L.**

Civil Action No. 8757.

District Court, D. New Jersey.

Sept. 30, 1946.

Bartholomew A. Sheehan and Charles L. Rudd, both of Camden, N. J., and Howard M. Kuehner, of Philadelphia, Pa., for plaintiff.

Albert K. Plone, of Camden, N. J., for defendant.

MADDEN, District Judge.

This issue is before the court on a motion to strike the bill filed herein upon the grounds that it does not set forth a cause of action and that this court is without the power to grant the relief prayed for.

The plaintiff is a corporation of the State of New York and the defendant is an unincorporated association, having its principal place of business at Camden, New Jersey. Diversity of citizenship is established and the jurisdictional amount involved is over $3000, exclusive of interests and costs, so that the jurisdictional requirements are established.

Upon filing of the bill an order to show cause was issued, with leave to either party to take testimony upon the return day of the order. On the return day the defendants moved to dismiss the bill, arguments of counsel ensued and briefs have been submitted.

The bill alleges that the plaintiff is engaged in the manufacturing business at Camden, New Jersey, and that on April 17, 1946, after an election held pursuant to the provisions of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., the National Labor Relations Board duly certified to plaintiff as sole collective bargaining agent for production and maintenance employees at the plant aforesaid Local Union 1737 United Steel Workers of America, C.I.O. (not the defendant) that the only votes cast were for the selected union, that the plaintiff employs approximately 180 employees of which approximately 130 are members of the selected union, that no employees of plaintiff are or have been members of defendant union. That on the 17th day of May, 1946, the selected union and plaintiff negotiated a bargaining agreement effective from May 1, 1946, according to the terms of which plaintiff undertook to recognize the union certified by the National Labor Relations Board as the sole collective bargaining agent for all the production and maintenance employees in the aforesaid plant; that on or about July 15, 1946, the defendant union demanded of plaintiff the right to be recognized as the sole collective bargaining agent for 8 employees (1 trucker, 1 shipping clerk and 6 warehousemen) all of whom were included in the contract previously entered into with the selected and certified union, and none of whom were members of the demanding defendant union. This request was refused by plaintiff and defendant made known its intention to picket the plant for the purpose of stopping shipments to and from the plant; that since that time defendant has caused the picketing of the plaintiff's plant to such an extent that shipment of materials to the plant has ceased and if the picketing and other persuasive acts continue, the plant will have to shut down and plaintiff will suffer irreparable loss to its business. The bill then prays for injunctive relief to compel the defendant to cease its activities.

Defendant, for the purpose of the motion, admits the allegations of the bill. Counsel for plaintiff frankly states that if the controversy is a labor dispute within the terms of the so-called Norris-LaGuardia Act, 29 U.S.C.A. §§ 101 to 115, the court is without jurisdiction to grant the relief prayed for but argues that the controversy here is not a labor dispute under the terms of that Act.

The facts simply stated are that a jurisdictional dispute has arisen with the defendant, affiliated with the A.F.L., disputing the right of the certified union, affiliated with the C.I.O., to represent the 8 employees involved. The defendant did not participate in the election held and the controversy did not arise until after certification by the National Labor Relations Board, and a contract was entered into concerning all the employees of the plaintiff between plaintiff and the certified union.

I might say at the outset that I have attempted to read all of the cases I could find in an attempt to obtain the benefit of judicial interpretation of the meaning of labor dispute under the terms of the Norris-LaGuardia Act including Union Premier v. Retail Food Clerks, 3 Cir., 98 F.2d 821; Lauf v. Shinner, 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872; New Negro Alliance v. Sanitary Grocery, 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012; Fur Workers v. Fur Workers, 70 App.D.C. 122, 105 F.2d 1; Apex v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; Carlson v. California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104; Oberman v. United Garment Workers, D.C., 21 F.Supp. 20; Virginian R. v. Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Drivers Union v. Lake Valley, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63; United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788; Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, Inc., 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200; A.F.L. v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855; American Medical Association v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434; United States v. American Federation of Musicians, D.C., 47 F.Supp. 304; Cafeteria Employees v. Angelos, 320 U.S. 293, 64 S.Ct. 126, 88 L.Ed. 58; Columbia River Packers v. Hinton, 315 U.S. 143, 147, 62 S.Ct. 520, 86 L.Ed. 750; Bakery and Pastry Drivers v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178; Donnelly Garment Co. v. International Ladies Garment Workers Union, 8 Cir., 99 F.2d 309; some of these I will hereafter discuss, the others I do not think particularly controlling in this matter.

The Norris-LaGuardia Act, 29 U.S.C.A. §§ 101 to 115, March 23, 1932, § 4, 29 U.S.C.A. § 104, provided:

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

"(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;

"(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;

"(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;

"(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

"(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

"(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

"(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title. Mar. 23, 1932, c. 90, § 4, 47 Stat. 70."

Section 13, 29 U.S.C.A. § 113, provides:

"When used in section 101–115 of this title, and for the purposes of such section —(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the

same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as defined in this section) of 'persons participating or interested' therein (as defined in this section).

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

"(d) The term 'court of the United States' means, any court of the United States whose jurisdiction has been or may be conferred or defined or limited by Act of Congress, including the courts of the District of Columbia. Mar. 23, 1932, c. 90, § 13, 47 Stat. 73."

The so-called Wagner-Connery Act was passed July, 1935, and it set up the machinery for collective bargaining by employees and methods of preventing unfair labor practices on the part of the employers. The Norris-LaGuardia Act was deemed necessary by Congress in order to prevent the judicial interpretation that had been placed upon the Clayton Act, § 20, 29 U.S.C.A. § 52, which had been adopted in 1914 and which prohibited the granting of injunctions by Federal Courts in matters arising out of labor disputes, except in certain cases and under terms and conditions therein set forth.

The Supreme Court, in reviewing the history of the Clayton and the Norris-LaGuardia Acts in the matter of United States v. Hutcheson (312 U.S. 219, 61 S.Ct. 463, 466, 85 L.Ed. 788), said:

"The Norris-LaGuardia Act removed the fetters upon trade union activities, which according to judicial construction § 20 of the Clayton Act had left untouched, by still further narrowing the circumstances under which the federal courts could grant injunctions in labor disputes. More especially, the Act explicitly formulated the 'public policy of the United States' in regard to the industrial conflict, and by its light established that the allowable area of union activity was not to be restricted, as it had been in the Duplex case [254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196], to an immediate employer-employee relation."

In reviewing the cases cited there is only one case in this circuit on point. Union Premier Food Stores v. Retail Food Clerks and Managers Union (3 Cir., 1938, 98 F.2d 821). In this case two unions, one affiliated with the C.I.O. and the other affiliated with the A.F.L., were contesting for membership of the employees of the plaintiff and the right to be their bargaining agent. During the contest the plaintiff company signed a contract with one union (A.F.L.) as the bargaining agent. Afterwards, the plaintiff company disregarded this contract and the contest was placed in the hands of the National Labor Relations Board. While in this position, and before an election had been held, and before the National Labor Relations Board had certified the lawful bargaining agent for the employees, the A.F.L. started picketing. The District Court granted injunction and the Circuit Court affirmed, with Judge Biggs dissenting. The Circuit Court ruled that in that case a labor dispute, under the terms of the Norris-LaGuardia Act, did not exist.

However, this case was decided very shortly after Lauf v. Shinner and New Negro Alliance v. Sanitary, and before all the other cases herein cited had been given consideration. This court must give great weight to the strong dissent of Judge Biggs when he points out so plainly that he considered the facts a labor dispute and that it had been recognized as such by the National Labor Relations Board, which body had taken jurisdiction of the matter and was preparing to hold an election under the terms of that act.

In Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872, decided February 28, 1938, the United States District Court, on application of the Shinner firm, granted an injunction against Lauf and others from picketing plaintiff's plant and doing other things in connection therewith. In this case the defendant union was attempting to organize the employees of the E. G. Shinner Company. Shinner refused to order its employees to join the union. No election had been held or bargaining agent certified by the National Labor Relations Board. No representative had been selected by the employees or any of them to negotiate with the Shinner firm. Picketing ensued and the District Court granted the injunction without making the findings of fact required by Section 7 of the Norris-LaGuardia Act, 29 U.S.C.A. § 107, upon the grounds that the controversy was not a labor dispute under the terms of the Norris-LaGuardia Act and that injunction would lie under the general equity powers of the court. This view was affirmed by the Circuit Court of Appeals but the Supreme Court reversed both the Circuit and District Courts and held such facts constituted a labor dispute under the Act.

This case was shortly followed by another decision of the Supreme Court, namely, the New Negro Alliance v. Sanitary Grocery Co., 1938, 303 U.S. 552, 58 S.Ct. 703, 706, 82 L.Ed. 1012. The New Negro Alliance, an association for the betterment and improvement of the Colored Race, requested the Grocery Company to adopt a policy of employing Negro clerks in certain of its stores in the course of personnel changes;

the respondent ignored the request and the petitioners caused one person to patrol in front of one of the respondent's stores one day carrying a placard which said, "Do Your Part! Buy Where You Can Work! No Negroes Employed Here!"— and caused or threatened a similar patrol of two other stores of Grocery Company. The information borne by the placard was true. The patrolling did not coerce or intimidate respondent's customers, did not physically obstruct, interfere with, or harass persons desiring to enter the store; the picket acted in an orderly manner, and his conduct did not cause crowds to gather in front of the store. Here there was no use of the governmental machinery established through the National Labor Relations Board; there had been no election under its supervision or certification by it of a bargaining agent.

Upon application of the Grocery Company the United States District Court, on hearing, granted an injunction and on appeal the Circuit Court affirmed the action of the District Court.

The Supreme Court in reversing both the District Court and the Circuit Court and holding that the facts involve a labor dispute said (303 U.S. at page 560, 58 S.Ct. at page 706):

"These definitions (par. 13 of the Act) plainly embrace the controversy which gave rise to the instant suit and classify it as one arising out of a dispute defined as a labor dispute. They leave no doubt that the New Negro Alliance and the individual petitioners (the Grocery Co.) are, in contemplation of the act, persons interested in the dispute.

"In quoting the clauses of section 13 we have omitted those that deal with disputes between employers and employees and disputes between associations of persons engaged in a particular trade or craft, and employers in the same industry. It is to be noted, however, that the inclusion in the definitions of such disputes, and the persons interested in them, serves to emphasize the fact that the quoted portions were intended to embrace controversies other than those between employers and employees; between labor unions seeking to represent employees and employers; and between

persons seeking employment and employers."

And the court said further (303 U.S. at page 562, 58 S.Ct. at page 707):

"The legislative history of the act demonstrates that it was the purpose of the Congress further to extend the prohibitions of the Clayton Act respecting the exercise of jurisdiction by federal courts and to obviate the results of the judicial construction of that act."

The next important decision dealing with the matter was Fur Workers v. Fur Workers, decided May 5, 1939, by the Circuit Court of the District of Columbia (70 App. D.C. 122, 105 F.2d 1); certiorari granted, per curiam, 308 U.S. 537, 60 S.Ct. 78, 84 L.Ed. 453; judgment affirmed, per curiam, 308 U.S. 522, 60 S.Ct. 292, 84 L.Ed. 443. In this case the employer engaged approximately 11 fur workers. None belonged to any union. One (Schwartz) joined a union affiliated with the C.I.O. The employer recognized the union as the representative of Schwartz but not for the other employees. Thereafter Schwartz went out on strike and with other members of his union began to picket. Thereafter he was joined by another worker (Haley). Then the remaining 9 fur workers joined the A.F.L. and were issued a charter and this union entered into a contract concerning terms of employment, etc., with the employer. Notwithstanding this, Schwartz, Haley and the C.I.O. union members continued picketing and on application to the District Court, by the employer and the A.F.L., they were enjoined. On appeal the Circuit Court reversed and held that it was a labor dispute under the terms of the Norris-LaGuardia Act. In that case 2 actual employees were on strike and picketing and there had been no election or certification by the National Labor Relations Board.

The Circuit Court in this instance made quite a review of Lauf v. Shinner and New Negro Alliance v. Sanitary and also Union Premier Food Stores v. Retail Food Clerks, and in the light of such decisions and in reversing the District Court said (70 App.D.C. at page 138, 105 F.2d at page 17):

"It is clear further that in such a situation there is no remedy for the employer under the National Labor Relations Act. That Act makes no provision for invocation of the election and certification powers of the Board by an employer. The result is an inequality before the law as between an employer and employees in this particular, namely, that while the employer has a substantive right to carry on his business, he lacks a legal remedy for protecting the same against injury through the struggle of competing unions, even though he be indifferent as to the choice of his employees between them; whereas the employees, in respect of their substantive rights of self-organization and collective bargaining, are afforded a protective remedy under the election and certification powers of the Board.

"We are constrained to conclude nevertheless that not even this argument of hardship can avail the appellee Zirkin's. Where, under the language of a statute, the intent of Congress is plain, it is the duty of the courts to apply the statute as it stands, even if the consequence is hardship or injustice. And we think it so clear under the Norris-LaGuardia Act and the National Labor Relations Act, considered together, that the controversy involved in the instant case is a labor dispute and that only the National Labor Relations Board in the first instance can end that dispute by certification, and that no injunction can issue under the Norris-LaGuardia Act in the absence of the findings required thereby, that we must enforce this plain intent of the statute without regard to the hardship upon the employer. Such argument of hardship must be addressed to Congress in respect of the possibility of an amendment of the National Labor Relations Act in such manner as will give to employers a right to invoke the jurisdiction of the Board for a settlement of disputes concerning rights of representation. It would be, in our view, clear judicial legislation, in which we have no right to indulge, for the court to give effect in this proceeding to the argument in question. The Supreme Court has held in Labor Board v. Jones & Laughlin that the onesidedness of the Act is a matter of Congressional policy which does not go beyond constitutional limitations."

Counsel for defendant cites Thornhill v. Alabama and Carlson v. California, but it is felt that these cases are not helpful or controlling because what was under consideration by the Supreme Court in those cases was the review of local enactments by the State in the Thornhill case and by the local governing body in the Carlson case forbidding picketing no matter how peaceful or under any circumstances under pain of criminal prosecution.

The next case that the court feels may shed some light on the subject was decided by the Supreme Court in Drivers Union v. Lake Valley, 1940, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63.

In this case there was a dispute between the drivers of various independent milk dealers and a union affiliated with the A.F.L. After the dispute arose the drivers joined a union affiliated with the C.I.O. On application to the United States District Court on the part of the milk dealers and drivers for injunction the court held that a labor dispute existed under the terms of the Norris-LaGuardia Act and refused injunction. The Circuit Court reversed. On certiorari to the Supreme Court it was held that this was a labor dispute under the terms of the Norris-LaGuardia Act and that the District Court had been right in denying injunctive relief.

In holding that the District Court had been right in its decision the court said (311 U.S. at page 99, 61 S.Ct. at page 126):

"Nor does the controversy cease to be a labor dispute, as the Circuit Court of Appeals thought, because the plaintiff dairies' employees became organized. This merely transformed the defendant's activities from an effort to organize non-union men to a conflict which included a controversy between two unions. A controversy 'concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment' is expressly included within the definition of a labor dispute in the Norris-LaGuardia Act."

The next case of interest was by the Supreme Court in United States v. Hutcheson, 1941, 312 U.S. 219, 61 S.Ct. 463, 85 L. Ed. 788.

In this case the defendant and others were indicted criminally by the United States for violation of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note. The defendant, Hutcheson, was a leader in a labor union that was in a jurisdictional dispute with another union regarding specific jobs in the Anheuser-Busch Brewery in St. Louis. As a result of the dispute defendant and others caused picketing not only of the employer, Anheuser-Busch but also of a tenant, The Gaylord Container Corporation, and a contracting firm engaged by the Gaylord Corporation for some construction work. The defendant and others were indicted on a charge that they had formed an illegal combination and conspiracy in violation of the Sherman Act. The indictment was dismissed on demurrer and such action was upheld by the Supreme Court.

In holding that such actions were excusable from criminal responsibility under the Clayton Act because such acts arose out of a labor dispute, the court said (312 U.S. at page 233, 61 S.Ct. at page 467):

"The refusal of the Carpenters to work for Anheuser-Busch or on construction work being done for it and its adjoining tenant, and the peaceful attempt to get members of other unions similarly to refuse to work, are plainly within the free scope accorded to workers by § 20 for 'terminating any * * * work or labor' or 'recommending, advising or persuading others by peaceful means so to do.'"

Also at page 235 of 312 U.S., at page 467 of 61 S.Ct., the court said:

"It would be strange indeed that although neither the Government nor Anheuser-Busch could have sought an injunction against the acts here challenged, the elaborate efforts to permit such conduct failed to prevent criminal liability punishable with imprisonment and heavy fines. This is not the way to read the will of Congress, particularly when expressed by a statute which, as we have already indicated, is practically and historically one of a series of enactments touching one of the most sensitive national problems."

This case was then followed by a series of cases where the Supreme Court of the

United States reviewed the actions of various State courts in granting, and on appeal, sustaining injunctions against picketing upon the theory that the granting of such injunctions violated the right of free speech guaranteed under the Bill of Rights.

In the first of these cases, Drivers Union v. Meadowmoor Co., 1941 (312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200), the Supreme Court upheld the right of the State of Illinois to prohibit by injunction picketing when such picketing was accompanied by great violence. In upholding the right of the State under such circumstances to grant injunction the court said (312 U.S. at page 294, 61 S.Ct. at page 555):

"The picketing in this case was set in a background of violence. In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful. So the supreme court of Illinois found. We cannot say that such a finding so contradicted experience as to warrant our rejection. Nor can we say that it was written into the Fourteenth Amendment that a State through its courts cannot base protection against future coercion on an inference of the continuing threat of past misconduct."

On the very same day the Supreme Court reversed the action of the Supreme Court of the State of Illinois in granting an injunction to prohibit picketing that had been peaceful and unattended by violence.

In A.F.L. v. Swing, 312 U.S. 321, at page 326, 61 S.Ct. 568, at page 570, 85 L.Ed. 855, the Court said:

"The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ. Communication by such employees of the facts of a dispute, deemed by them to be relevant to their interests, can no more be barred because of concern for the economic interests against which they are seeking to enlist public opinion than could the utterance protected in Thornhill's case. 'Members of a union might, without special statutory authorization by a state, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution.'"

And the Supreme Court adopted the same course in reversing injunctions granted by the State courts of the State of New York in Bakery and Pastry Drivers v. Wohl, 1942, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178, and Cafeteria Union v. Angelos, 1943, 320 U.S. 293, 64 S.Ct. 126, 88 L.Ed. 58.

An interesting case that may throw light on the subject is Columbia River Packers v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750, decided. In this case the Columbia River Packers brought a suit in the United States District Court to enjoin Hinton and others including the unions from violating the Sherman Act by creating a monopoly in the fish industry in that area. The respondents were the Pacific Coast Fisherman's Union, its officers and members, and two individuals who, like the petitioner, process and sell fish. Although affiliated with the C.I.O., the Union was primarily a fisherman's association, composed of fishermen who conduct their operations in the Pacific Ocean and navigable streams in Washington and Oregon and some of their employees. The fishermen own or lease fishing boats, ranging in value from $100 to $15,000 and carry on their business as independent entrepreneurs, uncontrolled by the petitioner or other processors.

The Union acts as a collective bargaining agency in the sale of fish caught by its members. Its constitution and by-laws provide that "Union members shall not deliver catches outside of Union agreements," and in its contracts of sale it requires an agreement by the buyer not to purchase fish from nonmembers of the Union. The Union's demand that the petitioner assent to such an agreement precipitated the controversy. Upon the petitioner's refusal, the Union induced its members to refrain from selling fish to the petitioner, and since the Union's control of the fish supply is extensive, the petitioner was unable to obtain the fish it needed to carry on its business.

The District Court held that this was not a labor dispute under the terms of the Norris-LaGuardia Act and granted an injunction. This action was reversed by the Circuit, but on certiorari to the Supreme Court that court ruled the same as the District Court.

In reversing the Circuit Court the Supreme Court said (315 U.S. at page 147, 62 S.Ct. at page 522):

"The controversy here is altogether between fish sellers and fish buyers. The sellers are not employees of the petitioners or of any other employer nor do they seek to be. On the contrary, their desire is to continue to operate as independent businessmen, free from such controls as an employer might exercise. That some of the fishermen have a small number of employees of their own, who are also members of the Union, does not alter the situation. For the dispute here, relating solely to the sale of fish, does not place in controversy the wages or hours or other terms and conditions of employment of these employees."

Through all of this examination of the law it is noted that in none of the foregoing cases do we have the exact same question as we have in the case at bar, namely; Does a labor dispute under the terms of the Norris-LaGuardia Act continue or exist after the certification by the National Labor Relations Board to the employer that a certain union is the sole bargaining agent for the employees?

Other cases may exist, but I have read of only two cases where this question was considered and both of these cases were District Court cases, and, like the present matter, were before the court on applications to dismiss the bill.

The first that I have reference to is Oberman v. United Garment Workers, D. C.W.D.Mo., 1937, 21 F.Supp. 20.

There, in denying the motion to dismiss the bill, Judge Mann, 21 F.Supp., at page 27, said:

"In the instant case there is no industrial dispute. If such dispute ever existed, it has been settled by the only authority that could settle such controversy, the National Labor Relations Board."

It will be noted, however, that this case was decided by Judge Mann before the Supreme Court spoke in Lauf v. Shinner, supra; New Negro Alliance v. Sanitary Grocery, supra, and the other cases herein reviewed, and he did not have the benefit of their views or their binding force upon him.

The other case where this question was considered was Yoerg Brewing Co. v. Brennan, 1945, 59 F.Supp. 625, by the District Court of Minnesota.

In this case, upon application, the District Judge granted a temporary restraint prohibiting picketing and other activities, and because of the seriousness of the problem called in the other two judges of the district and the court sat en banc, and considered the motion to strike the bill and quash the temporary restraint. The opinion is written by Judge Nordbye and shows a serious review by those judges of most of the cases reviewed herein, including the Union Premier v. Retail Food Clerks, supra and Oberman v. United Garment Workers, supra.

After a review of the cases and the facts, 59 F.Supp. at page 633, the court said:

"Summarizing our views, therefore, we are constrained to hold that the only jurisdiction conferred by the National Labor Relations Act upon the Federal Courts is that which is conferred upon the Circuit Court of Appeals; that the applicability of the Norris-LaGuardia Act to a labor dispute is unimpaired by the National Labor Relations Act in so far as the jurisdiction of the District Courts is concerned; that the action of the National Labor Relations Board in endeavoring to settle a dispute as to the bargaining representatives and agents of the employees by its certification after election does not prevent an aggrieved union from striking and using all peaceful methods in proclaiming its dissatisfaction and in endeavoring to enlist public opinion in support of its cause; and that a strike under such circumstances by the aggrieved union must be characterized as one which stems out of a labor dis-

pute and therefore, any activities growing out of such strike cannot be restrained by this Court without a strict compliance with the Norris-LaGuardia Act."

This court, therefore, in the light of the foregoing opinions, is constrained to hold that a jurisdictional strike or controversy wherein one union is engaging in an argument with another union over which union shall represent the employees of a particular concern is a labor dispute regardless of when such dispute starts, within the terms of the Norris-LaGuardia Act, and the court is powerless to enjoin the acts complained of in the bill.

I come to this conclusion of law with a firm conviction that all morals and equity are on the side of the employer who, without cause of his own, finds himself enmeshed in such a controversy and faces the loss of his business and is powerless to prevent it.

I am mindful to warn the defendant in this case and through the defendant, others interested in the cause of labor not to be jubilant or rejoice too much in gaining the decision in the present controversy. I speak not as a so-called reactionary but as one who has labored as physically as any of the defendants. I have in my time worked in industrial plants before the passage of the Norris-LaGuardia Act or the Wagner-Connery Act, without the benefit of a union or a bargaining agent, for 9¾ hours straight time per day and a 54 hour week, and, therefore, know the need of labor unions, but I say that it is time for the unions themselves to consider some things other than just who will represent a certain group, and thus start these jurisdictional strikes and cause serious unemployment of the very laboring classes that they are primarily supposed to represent and help.

I fear that by such continued activities they will bring down upon themselves reactionary legislation which is always bad legislation, for we are a liberal government and a liberal people.

I must be mindful at the very least of the argument of the government before the Supreme Court in United States v. Hutcheson, supra, which speaks on this problem, and for the defendant's consideration, I quote it:

"There is no form of labor warfare so opposed to the public interest and to the interest of organized labor itself as the jurisdictional strike which stops the commerce of an employer who is trying to be fair to organized labor. An employer who finds himself the victim of such a strike is powerless. There is no concession he can make which will stop the attack on his business. Similarly, the union whose relations with the employer the other union seeks to disrupt cannot rely on its satisfactory service or its superior craftsmanship to maintain its position; it has no weapon, other than ruthless economic warfare, to defend itself against the aggressive tactics of those who would destroy it."

Does not this statement fit the equities of the present case?

And also the court's statement in the Yoerg Brewing Co. v. Brennan, supra:

"It may be urged that the situation presented strongly emphasizes the extreme one-sidedness of the National Labor Relations Act legislation; that is, the employer is bound to comply with the orders of the Board, but the employees are free to flout the Board's decision and create the anomalous and often calamitous situation of an employer's being caught, without fault on his part, between the upper and nether millstones. We are not unmindful of the apparent harsh consequences of our ruling, but such a result must not be permitted to affect our judgment in applying the law in the field of interpretation. We do not have the power to legislate. In labor disputes, we have only such equity jurisdiction as Congress has seen fit to grant."

With these observations and in accordance with the opinions herein reviewed, the bill will be dismissed. Prepare an order.